IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PITTSBURGH DIVISION

| | |
|---|---|
| BLAIR DOUGLASS,<br>Plaintiff,<br>v.<br>SEWING PARTS ONLINE, INC.,<br>Defendant. | Civil Action No. 2:26-cv-01642<br>COMPLAINT |

**COMPLAINT**

Plaintiff Blair Douglass ("Douglass" or "Plaintiff") brings this action against Defendant Sewing Parts Online, Inc. ("Sewing Parts Online" or "Defendant"), and makes the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to the allegations pertaining to Douglass, which are based on personal knowledge:

**NATURE AND SUMMARY OF THE ACTION**

1. Defendant owns, leases, and/or operates physical facilities, including at least a retail store located at 115 West Christi Drive, Dickson, Tennessee 37055 ("Retail Store"), and a warehouse located at 220 Tennsco Drive, Dickson, Tennessee 37055 ("Warehouse"). *See* Sewing Parts Online, *Contact Support*, https://www.sewingpartsonline.com/pages/contact-us (last visited Aug. 4, 2026).

2. From its physical facilities, Defendant makes various goods, like sewing machines, fabric, and accessories, and services, like customer service, return processing, and technical support, available to consumers across the United States and internationally. *See* Sewing Parts Online, *Shipping Policy*, https://www.sewingpartsonline.com/policies/shipping-policy (last

visited Aug. 4, 2026); *see also* Sewing Parts Online, *The Sewing Parts Online Story*, https://www.sewingpartsonline.com/pages/about-us (last visited Aug. 4, 2026) ("With over 1,000,000 orders shipped worldwide since we opened, we will continue to expand the product lines and brands that we carry to provide the largest selection available.")

3. Consumers may *physically* access the goods and services at Defendant's physical facilities by visiting the Retail Store to browse, evaluate, and purchase Defendant's goods and obtain its services. *See* Sewing Parts Online, *Store Locations*, https://www.sewingpartsonline.com/pages/store-locations (last visited Aug. 4, 2026).

4. Consumers may also *remotely* access these same goods and services through the internet at Defendant's website, located at https://www.sewingpartsonline.com/ ("Website").

5. Defendant expressly represents, for example, that it carries a complete selection of Baby Lock sewing machines and sergers both "online and in our retail store" and invites Website users to visit its Retail Store, which is "packed with many of these same models." *See* Sewing Parts Online, *Baby Lock Sewing Machines*, https://www.sewingpartsonline.com/collections/babylock-sewing-machines (last visited Aug. 4, 2026).

6. Defendant provides customer service and technical support relating to products sold through the Website, including assistance identifying compatible parts, determining product availability, selecting products, modifying orders, locating replacement items, and initiating returns and exchanges. *See* Sewing Parts Online, *Contact Support*, https://www.sewingpartsonline.com/pages/contact-us; Sewing Parts Online, *Refund Policy*, https://www.sewingpartsonline.com/policies/refund-policy (last visited Aug. 4, 2026).

7. Defendant uses its Warehouse to maintain inventory and process and fulfill orders placed through the Website. Defendant's Shipping Policy confirms that Website orders remain in Defendant's warehouse until they are processed and shipped and directs consumers to contact Defendant to determine whether a particular item is in stock before ordering. *See* Sewing Parts Online, *Shipping Policy*, https://www.sewingpartsonline.com/policies/shipping-policy (last visited Aug. 4, 2026).

8. Defendant also administers its online return, exchange, and replacement services through the Warehouse. Defendant instructs consumers to send returned products to its "Returns Dept" at 220 Tennsco Drive. Defendant then physically receives and inspects those products before issuing a refund, processing an exchange, or shipping a replacement product. *See* Sewing Parts Online, *Refund Policy*, https://www.sewingpartsonline.com/policies/refund-policy (last visited Aug. 4, 2026).

9. Defendant's Website, Retail Store, and Warehouse are thus parts of an integrated consumer retail operation. Defendant's own account of its history explains that its online business began by operating the Website from the back of its Retail Store and expanded as Defendant hired employees to fulfill increased online demand. *See* Sewing Parts Online, *The Sewing Parts Online Story*, https://www.sewingpartsonline.com/pages/about-us (last visited Aug. 4, 2026).

10. Douglass is legally blind.

11. As a result of his blindness, Douglass uses screen reader auxiliary aids to remotely access the goods and services available at Defendant's Retail Store and Warehouse through the Website.

12. This action arises from Defendant's ongoing failure to effectively communicate with Douglass because the Website is not sufficiently compatible with screen reader auxiliary aids,

thereby denying Douglass full and equal access to the goods and services available at Defendant's physical facilities.

**JURISDICTION AND VENUE**

13. Some of the claims alleged arise under Title III such that this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188.

14. Upon information and belief, Defendant promotes the Website, and the goods and services it sells via the Website, in Pennsylvania and to consumers who Defendant knows reside in Pennsylvania.

15. Defendant's in-state sales through the Website, and Defendant's in-state promotion of the Website and the goods and services thereon, are closely related to Douglass's claim that Defendant discriminates against blind shoppers when selling Defendant's goods and services on the Website.

16. Defendant purposefully avails itself of the privilege of conducting activities in Pennsylvania by operating an interactive commercial website that facilitates the knowing and repeated transmission of computer files into Pennsylvania over the internet.[1]

17. Although undisclosed in its Privacy Policy, *see* Sewing Parts Online, *Privacy Policy*, https://www.sewingpartsonline.com/policies/privacy-policy (last visited Aug. 4, 2026), Defendant places files of information, or cookies, on the hard drives of the computers, smartphones, and other devices of every Pennsylvania consumer when those devices are used to

---

[1] *See Murphy v. Rolex Watch USA, Inc.*, No. 1:23-CV-00086-SPB, 2024 U.S. Dist. LEXIS 84515, at *17-18 (W.D. Pa. May 9, 2024) (Lanzillo, M.J.) (exercising personal jurisdiction over out-of-forum website operator in a website accessibility case); *Gniewkowski v. Lettuce Entertain You Enters.*, No. 2:16-cv-1898-AJS, Order, ECF 123 (W.D. Pa. Apr. 25, 2017), *clarified by Order of Court*, ECF 169 (W.D. Pa. June 22, 2017) (Schwab, J.) (same).

visit the Website.[2] These cookies include at least the following: (a) localization, which localizes the consumer's shopping cart to a particular country; (b) cart_currency, which records the currency associated with the consumer's shopping cart; (c) _shopify_y, which identifies the consumer's device for analytics purposes; (d) _shopify_s, which identifies the consumer's browser session; (e) _shopify_essential, which contains information concerning the consumer's session and checkout activity and data used to detect tampering; (f) _shopify_analytics, which contains analytics data concerning the consumer's use of the Website; and (g) _shopify_marketing, which contains marketing data concerning the consumer's use of the Website. *See* Sewing Parts Online, *Homepage*, https://www.sewingpartsonline.com/ (last visited Aug. 4, 2026); Shopify, *Cookie Policy—Merchant Storefronts*, https://www.shopify.com/legal/cookies (last updated June 11, 2026)..

18. Douglass was injured when he attempted to remotely access the goods and services available at Defendant's physical facilities through the Website while Douglass was physically located in Pittsburgh, Pennsylvania.

19. Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the acts and omissions giving rise to Douglass's claims occurred.

## **PARTIES**

20. Douglass is a natural person over the age of 18.

21. He resides in and is a citizen of Pittsburgh, Pennsylvania.

[2] A. Benjamin Spencer, *Jurisdiction and the Internet: Returning to Traditional Principles to Analyze Network-Mediated Contacts*, 2006 U. Ill. L. Rev. 71 (2005), http://illinoislawreview.org/wp-content/ilr-content/articles/2006/1/Spencer.pdf.

22. He works for an area university as a Program Administrator, managing all phases of the admission process for a highly competitive science training program. Douglass is also a licensed Pennsylvania attorney. He graduated from the University of Pittsburgh School of Law. While at Pitt Law, Douglass completed a judicial internship in the United States District Court for the Western District of Pennsylvania.

23. Douglass has advocated for blind individuals his entire life.[3]

24. Seven different judges in the United States District Court for the Western District of Pennsylvania have appointed Douglass to represent nationwide classes of blind consumers in class actions concerning the inaccessibility of commercial websites, including most recently in *Douglass v. Levain Bakery Cookie Co., LLC*, No. 2:25-cv-01722, 2026 U.S. Dist. LEXIS 65659 (W.D. Pa. Mar. 26, 2026) (Kelly, J.), *Douglass v. DK Household Brands Corp.*, No. 2:25-cv-01183, 2026 U.S. Dist. LEXIS 65297 (W.D. Pa. Mar. 25, 2026) (Wiegand, J), and *Douglass v. Melnor, Inc*., No. 2:25-cv-00670, 2025 U.S. Dist. LEXIS 203770 (W.D. Pa. Oct. 16, 2025) (Hardy, J.).

25. Defendant is a Tennessee corporation with a principal place of business in Tennessee.

26. Defendant offers goods and services to the public from physical facilities that Defendant owns, operates, and/or controls, including its corporate offices, manufacturing facilities, and shipping and/or distribution centers.

---

[3] Zak Koeske, *Pitt student aims to rise above stereotype*, Pittsburgh Post-Gazette (July 23, 2009), https://www.post-gazette.com/local/south/2009/07/23/Pitt-student-aims-to-rise-above-stereotype/stories/200907230364 ("Blindness can't hold you back from doing anything you want to do[.] …Blindness is simply a physical condition. You have to make a few adaptations, but those aren't big enough to affect your ability to do a job competently. …There are always going to be some people who doubt your ability. ... I have no trouble trying to prove them wrong.").

27. Defendant's physical facilities are open to the public, as Defendant allows the public to access the goods and services available at its physical facilities remotely through the Website.

**STANDING UP FOR TITLE III OF THE ADA**

28. "Congress passed the ADA in 1990 to fix a serious problem—namely, the seclusion of people with disabilities resulting in explicit and implicit discrimination. . . . The disabled population hoped that, as a result of the ADA, their lives would no longer be shaped by limited access and the inability to choose. . . . However, reality—a lack of compliance with the ADA and severe underenforcement of the statute—soon destroyed this hope."[4]

29. More than thirty years "after the passage of the ADA, numerous facilities are still not compliant leaving the disabled population in a second-class citizenship limbo. Title III of the ADA allows both the U.S. Attorney General[5] and private individuals[6] to sue, but the rate at which [ ] the Attorney General [is] bringing suit seeking compliance is extremely low. The Department of Justice's Disability Section, tasked with ADA enforcement, is understaffed[.]"[7]

[4] Kelly Johnson, *Testers Standing up for the Title III of the ADA*, 59 Cas. W. Res. L. Rev. 683, 684 (2009), http://scholarlycommons.law.case.edu/caselrev/vol59/iss3/6 (*citing* H.R. REP. No. 101-485, pt. 2, at 28-29 (1990); Elizabeth Keadle Markey, *The ADA's Last Stand?: Standing and the Americans with Disabilities Act*, 71 Fordham L. Rev. 185 (2002) (arguing for a more lenient standard for standing under the ADA); and Samuel R. Bagenstos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation*, 54 UCLA L. Rev. 1, 3 (2006) (discussing the need for private enforcement in Title III)).
[5] 42 U.S.C. § 12188(b).
[6] 42 U.S.C. § 12188(a).
[7] Johnson, *supra* note 5.

30. Thus, "private suits by necessity represent the main tool for ensuring compliance with Congress' intent in passing the ADA,"[8] most of which suits "are brought by a small number of private plaintiffs who view themselves as champions of the disabled."[9]

31. The U.S. Department of Justice ("DOJ") supports this dynamic, recognizing that because it "cannot investigate every place of public accommodation," "[p]rivate plaintiffs play an important role in enforcing the ADA[.]"[10]

32. Consistent with these policies, Douglass files this case to ensure Defendant provides full and equal access to the goods and services that Defendant makes available to the public from its physical facilities.

## **SUBSTANTIVE ALLEGATIONS**

33. Screen reader auxiliary aids allow blind persons to use websites and mobile apps to remotely access physical facilities, and the goods and services retailers provide at those physical facilities, like customer service, return processing, and technical support.

34. Two of the most commonly used aids are JAWS from Freedom Scientific (available on Windows computers), and VoiceOver (available on macOS and iOS devices).

35. "JAWS, Job Access With Speech, is the world's most popular screen reader, developed for computer users whose vision loss prevents them from seeing screen content or navigating with a mouse. JAWS provides speech and Braille output for the most popular computer

---

[8] *Betancourt v. Ingram Park Mall*, 735 F. Supp. 2d 587, 596 (W.D. Tex. 2010).
[9] *Id.* (*quoting Molski v. Evergreen Dynasty Corp*., 500 F.3d 1047, 1062 (9th Cir. 2007)); *D'Lil v. Best Western Encina Lodge & Suite*s, 538 F.3d 1031, 1040 (9th Cir. 2008) (same).
[10] Statement of Interest of the United States of America, *ERC v. Abercrombie & Fitch Co.*, No. 1:09-cv-03157 (D. Md.), ECF No. 38, at *1 (July 6, 2010); *See also Hensley v. Eckerhart*, 461 U.S. 424, 445 (1983) ("All of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.").

applications on your PC. You will be able to navigate the Internet, write a document, read an email and create presentations from your office, remote desktop, or from home."[11]




36. "VoiceOver is an industry-leading screen reader that tells you exactly what's happening on your device. Auditory descriptions of elements help you easily navigate your screen through simple gestures on a touchscreen or trackpad or a Bluetooth keyboard. . . . VoiceOver can also describe people, objects, text, and graphs in greater detail than ever. It's available in more than 60 languages and locales on iPhone, iPad, Mac, Apple Watch, Apple TV, and HomePod and offers deep customization options for your needs. Select and modify your favorite built-in voice for speech feedback, and tailor its verbosity, speed, and accompanying sound and haptic feedback to your own preferences."[12]

37. The images to the right show a retailer coding its website so that blind shoppers can remotely access physical facilities, and the goods and services provided at those physical facilities.




[11] *JAWS*®, Freedom Scientific, https://www.freedomscientific.com/products/software/jaws/ (last accessed Aug. 4, 2026).
[12] *Accessibility*, Apple, https://www.apple.com/accessibility/vision/ (last accessed Aug. 4, 2026).

38. The first image illustrates what shoppers perceive visually when browsing the retailer's website with an iPhone. The second image shows the audio description highlighted for that image in green.

39. Although invisible to the eye, screen reader auxiliary aids read the highlighted text of the second image aloud to describe that image to shoppers who cannot perceive content visually.

40. In this example, when a screen reader user tabs to the image file, the website announces, "[o]ne burlap and cotton tote bag with a custom printed architectural company logo."

41. Blind shoppers require audio descriptions, frequently called "alternative text," like this to access physical facilities, and the goods and services provided at physical facilities, through a website.

42. Unfortunately, Defendant fails to effectively communicate with Douglass because the Website is not sufficiently compatible with screen reader auxiliary aids, thereby denying Douglass full and equal access to the goods and services available at Defendant's physical facilities.

43. For example, from visiting the Website in May 2026, and from investigations performed on his behalf, Douglass learned that Defendant failed to effectively communicate with him, and with all blind screen reader users, in at least the following ways:

(a) Defendant visually communicates the location of its checkout platform with a shopping cart button near the top of the Website. Consumers who perceive content visually will recognize this button and understand that by clicking it, Defendant will redirect them to its online checkout platform. Defendant fails to effectively communicate this same information to screen reader users, including Plaintiff, because Defendant has not labeled the button with alternative text. This ineffective communication makes it more difficult, or impossible, for Plaintiff to locate

Defendant's online checkout platform and complete a purchase. Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/1190543340/6fd7e7806f.

(b) Defendant visually communicates information about its customer assistance services. The Website features a Chat button, which consumers may click to access Defendant's help desk or instant messenger. This button "floats" atop the Website's underlying pages and content, meaning it remains on the screen at all times while consumers are navigating the Website. As a result, consumers who perceive content visually can easily and quickly perceive and activate this button during their shopping experience. Defendant fails to effectively communicate this same information to screen reader users, including Plaintiff, because screen reader users must tab through most of the content of the Website's webpages before eventually reaching the Chat button. This ineffective communication makes it more difficult, or impossible, for Plaintiff to find help purchasing Defendant's goods or reporting the Website's access barriers so they can be fixed. Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/1190543339/23588662ab.

(c) Defendant visually communicates customer support information in a pop-up window on the Website. Consumers who perceive content visually will see the pop-up and can interact with it to access Defendant's customer support services. Defendant fails to effectively communicate this same information to screen reader users, including Plaintiff, because the Website fails to notify screen reader users when the pop-up appears. This ineffective communication makes it difficult, or impossible, for Plaintiff to find the help he needs or report the Website's access barriers so they can be fixed. Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/1190543746/11b9ae1999.

(d) Defendant visually communicates information about its goods and services on the Website. Consumers who perceive content visually can use the Website to browse, research, and purchase Defendant's products, contact Defendant's customer service, and more. Defendant fails to effectively communicate this same information to screen reader users, including Plaintiff, because a majority of the Website is inaccessible to screen readers. This ineffective communication makes it difficult, or impossible, for Plaintiff to independently perceive Defendant's goods and services and complete an online purchase. Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/1190543354/12882e5764.

44. Douglass, through his counsel, contacted Defendant at support@sewingpartsonline.com and admin@sewingpartsonline.com on July 15, 2026 to discuss the discrimination that Plaintiff experienced on Defendant's Website and the resolution of Plaintiff's claim. This correspondence provided: "[c]onsistent with public policy encouraging the resolution of 'dispute[s] informally by means of a letter[,]' *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1208 (9th Cir. 2006), we request an opportunity to discuss the discrimination Blair has experienced." To assist Defendant in its investigation of Plaintiff's claim, this correspondence also included a copy of a complaint underlying Plaintiff's ADA claim.

45. Within a couple weeks of receiving Douglass's accommodation request, Defendant sued Douglass in a Tennessee state court (the "Tennessee Lawsuit").

46. Defendant's ongoing failure to effectively communicate with Douglass, together with Defendant's insufficient policies and practices giving rise to this ineffective communication, deny Douglass full and equal access to Defendant's physical facilities and the goods and services Defendant makes available at its physical facilities.

47. Defendant's ongoing failure to effectively communicate with Douglass, together with Defendant's insufficient policies and practices giving rise to this ineffective communication, and the Tennessee Lawsuit, humiliate and deter Douglass from using the Website to access Defendant's physical facilities and the goods and services Defendant makes available at its physical facilities.

48. Still, Douglass intends to return to the Website to determine if Defendant effectively communicates with Douglass and, if so, to attempt to access the goods and services Defendant makes available at its physical facilities, like sewing tools and accessories.

## SUBSTANTIVE VIOLATIONS

### COUNT I
### Title III of the ADA, 42 U.S.C. § 12181 *et seq*.

49. The assertions contained in the previous paragraphs are incorporated by reference.

50. Douglass is a person with a "disability." 42 U.S.C. §§ 12102(1)(A), 12102(2)(A).

51. Defendant is a "public accommodation." 42 U.S.C. §§ 12181(7)(E).

52. Defendant violated the ADA by, among other things, denying Douglass the full and equal enjoyment of goods, services, facilities, privileges, advantages, or accommodations; denying Douglass an opportunity to participate in or benefit from goods, services, facilities, privileges, advantages, or accommodations; providing Douglass an unequal opportunity to participate in or benefit from goods, services, facilities, privileges, advantages, or accommodations; excluding Douglass, denying him services, and treating him differently than others because of the absence of auxiliary aids and services, or the failure to modify policies and practices; and failing to effectively communicate with Douglass. 42 U.S.C. §§ 12182(a), 12181(b)(1)(A)(i), 12181(b)(1)(A)(ii), 12182(b)(2)(A)(ii), 12182(b)(2)(A)(iii).

53. These violations denied Douglass full and equal access to Defendant's physical facilities and the goods and services Defendant makes available at its physical facilities.

54. These violations also humiliate and deter Douglass from using the Website to access Defendant's physical facilities and the goods and services Defendant makes available at its physical facilities, thereby forcing Douglass to wait until Defendant elects to retrofit the Website to be accessible.

**COUNT II**
**42 U.S.C. § 12203 Retaliation/Coercion**

55. The assertions contained in the previous paragraphs are incorporated by reference.

56. Plaintiff brings this specific retaliation claim against Defendant, pursuant to the ADA's prohibition against retaliation and coercion as set forth in 42 U.S.C. § 12203.

57. The ADA statutory retaliation/coercion proscription provides:

> **(a) Retaliation**
>
> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.
>
> **(b) Interference, coercion, or intimidation**
>
> It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.
>
> **(c) Remedies and procedures**
>
> The remedies and procedures available under sections 12117, 12133, and 12188 of this title shall be available to aggrieved persons for violations of subsections (a) and (b), with respect to subchapter I, subchapter II and subchapter III, respectively.

42 U.S.C. § 12203.

58. The U.S. Department of Justice has promulgated enforceable regulations regarding § 12203, as any such violation thereof pertains to public accommodations pursuant to Title III of the ADA, 12281, *et seq*. To this end, 28 CFR § 36.206, Retaliation or Coercion, provides:

> (a) No private or public entity shall discriminate against any individual because that individual has opposed any act or practice made unlawful by this part, or because that individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the Act or this part.
>
> (b) No private or public entity shall coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by the Act or this part.
>
> (c) Illustrations of conduct prohibited by this section include, but are not limited to:
>
> > (1) Coercing an individual to deny or limit the benefits, services, or advantages to which he or she is entitled under the Act or this part;
> >
> > (2) Threatening, intimidating, or interfering with an individual with a disability who is seeking to obtain or use the goods, services, facilities, privileges, advantages, or accommodations of a public accommodation;
> >
> > (3) Intimidating or threatening any person because that person is assisting or encouraging an individual or group entitled to claim the rights granted or protected by the Act or this part to exercise those rights; or
> >
> > (4) Retaliating against any person because that person has participated in any investigation or action to enforce the Act or this part.

59. The plain unambiguous language of the statutory and regulatory frameworks prohibits discriminating against an individual because that individual engaged in his statutorily and constitutionally protected conduct pursuant to this chapter of the ADA, 42 U.S.C. 12181, *et seq*., Title III of the ADA.

60. The plain unambiguous language of the statutory and regulatory frameworks prohibits coercing, intimidating, threatening, or interfering with any individual in the exercise and

enjoyment of any right granted and protected by this chapter of the ADA, 42 U.S.C. 12181, *et seq*., Title III of the ADA.

61. As a remedial civil rights statute, the ADA is to be broadly construed to effectuate its purpose.

62. "To establish a prima facie case of retaliation under the ADA, a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997).

63. "This is the same prima facie test for retaliation applied in the context of any of the anti-discrimination statutes." *Isler v. Keystone Sch. Dist*., 2008 WL 3540603, at *5 (W.D. Pa. Aug. 12, 2008) (J. Schwab), *aff'd*, 335 Fed. Appx. 200 (3d Cir. 2009) (unpublished).[13]

64. Defendant is a public accommodation under the ADA and a public entity under 28 CFR § 36.206.

65. Douglass engaged in protected activity when, on July 15, 2026, his counsel sent a correspondence to Defendant (a) explaining with video evidence some of the ways in which Defendant failed to communicate with blind consumers who use screen reader auxiliary aids and (b) requesting the company "remedy ongoing violations of the Americans with Disabilities Act."

66. The letter demonstrates that Douglass participated in an investigation into the Website's accessibility and his opposition to Defendant's discriminatory practice.

---

[13] *See also, Lauren W. ex rel. Jean W. v. Deflaminis*, 480 F.3d 259, 267 (3d Cir. 2007) (collecting cases) (elements of retaliation claim under the Rehabilitation Act same as under 42 U.S.C. § 1983 or ADA); and *Fogleman v. Mercy Hosp., Inc*., 283 F.3d 561, 567-68 (3d Cir. 2002).

67. These activities are precisely the type of conduct that 42 U.S.C. § 12203(a) protects, and which the United States District Court for the Western District of Pennsylvania has described previously as "clearly, the most expedient and cost-effective means of resolving legal matters." *Sipe v. American Casino & Entertainment Properties, LLC*, 2016 WL 1580349, *3 (W.D. Pa. Apr. 20, 2016) (J. Schwab).

68. Courts in the Third Circuit (and throughout the United States, for that matter) have held that "[u]nder certain conditions, the filing of a lawsuit may be considered a retaliatory act." *Schneck v. Saucon Valley School Dist.*, 340 F.Supp.2d 558, 572 (E.D. Pa. 2004); *see also*, *Suchenko v. ECCO USA, Inc.*, No. 2:18-cv-0562, 2018 U.S. Dist. LEXIS 139050, at *9 (W.D. Pa. Aug. 16, 2018) (Schwab, J.) (denying motion to dismiss ADA retaliation claim brought by blind plaintiff against a website operator that sued plaintiff in Utah after receiving plaintiff's pre-litigation correspondence).

69. The facts of this case undoubtedly present the "certain conditions" in which the filing of a lawsuit constitutes an adverse action.

70. On July 15, 2026, Douglass requested an accommodation by sending Defendant a letter demanding that Defendant make its Website screen reader accessible.

71. Just a couple weeks later, Defendant sued Douglass in a state he has never been to. This is precisely the type of "powerful instrument of coercion or retaliation" that the Supreme Court recognizes "can have a chilling effect…upon an [individual's] willingness to engage in protected activity[.]" *Bill Johnson's Rest., Inc. v. NLRB*, 461 U.S. 731 (1983) (internal quotation omitted) ("[a] lawsuit no doubt may be used by an employer as a powerful instrument of coercion or retaliation" and can have a "chilling effect of a state lawsuit upon an employee's willingness to engage in protected activity…").

72. Defendant would not have sued Douglass "but for" his counsel's July 15, 2026 correspondence, thereby demonstrating a causal connection between Douglass's protected activity and Defendant's adverse action.

73. What's more, the filing of the Tennessee Lawsuit just a couple weeks after receiving Douglass's counsel's correspondence demonstrates antagonism sufficient to prove a causal connection.

74. The speed with which Defendant sued Douglass upon receipt of his counsel's correspondence evidences of "a pattern of antagonism coupled with timing" to establish causation. *In T.F. v. Fox Chapel Area Sch. Dist*., 2013 WL 5936411, *15 (W.D. Pa. Nov. 5, 2013), *aff'd*, 589 Fed. Appx. 594 (3d Cir. 2014) (unpublished) (citing *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir.2007).

75. The purpose of Defendant's Tennessee Lawsuit is to coerce, intimidate, and threaten Douglass and to retaliate against him for having contacted Defendant on or about July 15, 2026, requesting a reasonable accommodation pursuant to the ADA.

76. And Defendant's Tennessee Lawsuit has had its intended effect.

77. Defendant's actions have made Douglass increasingly fearful of continuing to exert his rights in this case and others pursuant to the ADA.

78. Defendant's actions have caused Douglass to suffer and to continue to suffer emotional distress, mental anguish, and dignitary harm.

79. Plaintiff has a reasonable belief that Defendant's discriminatory conduct will continue into the future. Further, as this type of discriminatory activity is easily capable of repetition, any attempt by Defendant to cease the offending action will not moot this case.

## PRAYER FOR RELIEF

WHEREFORE, Douglass requests judgment as follows:

(A) A declaratory judgment that at the commencement of this action Defendant was in violation of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, in that Defendant took insufficient action to ensure Douglass could use the Website to fully, equally, and independently access Defendant's physical facilities and the goods and services that Defendant makes available at its physical facilities;

(B) A permanent injunction under 42 U.S.C. § 12188(a)(2) and 28 C.F.R. § 36.501 which directs Defendant to take all steps necessary to ensure Defendant's physical facilities and the goods and services that Defendant makes available at its physical facilities are fully, equally, and independently accessible to Douglass by the Website, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure that Defendant has adopted and is following policies and practices that will cause Defendant to remain in compliance with the law—the specific injunctive relief requested by Douglass is described more fully below;

(1) Within 60 days of the Court's order, Defendant shall designate a team of its employees and/or contractors as the accessibility coordination team for the Website, which team will be responsible for ensuring Defendant's compliance with the Court's order;

(2) Within 90 days of the Court's order, Defendant shall appoint or retain an Accessibility Consultant who is knowledgeable about digital accessibility, the ADA, and the Web Content Accessibility Guidelines 2.1 A/AA, developed by the W3C and available at https://www.w3.org/TR/WCAG21/. The Accessibility Consultant's duties shall include assisting Defendant in ensuring the Website conforms with Web Content Accessibility Guidelines 2.1 A/AA and provides effective communication to screen reader users.

(3) Within 120 days of the Court's order, Defendant shall develop and implement an Accessibility Strategy to ensure the Website conforms with Web Content Accessibility Guidelines 2.1 A/AA and provides effective communication to screen reader users within 18 months of the Court's order.

(4) Within 120 days of the Court's order, Defendant shall develop and publish an Accessibility Statement that advises visitors that Defendant ensures the Website conforms with Web Content Accessibility Guidelines 2.1 A/AA and provides effective communication to screen reader users, and includes an accessibility feedback form that invites visitors to contact Defendant with their accessibility concerns or questions. Defendant shall add a link at the beginning of the Website's landing pages, directing screen reader users to the Accessibility Statement.

(5) Within 150 days of the Court's order, Defendant shall ensure its customer service personnel are trained to assist individuals with disabilities (including individuals who are blind) who encounter difficulties using the Website, and to forward any accessibility-related questions or complaints to Defendant's accessibility coordination team so they may be remediated.

(6) Within 180 days of the Court's order, Defendant shall modify its existing bug fix policies, practices, and procedures to include the elimination of bugs that cause the Website to fail to provide effective communication to screen reader users. Defendant shall ensure that any bugs that cause the Website to fail to provide effective communication to screen reader users are remedied with the same level of priority (*e.g.*, speed, resources used to remedy, etc.) as any other equivalent loss of function for individuals who are not blind.

(7) Within 210 days of the Court's order, Defendant shall train all employees responsible for website or mobile application design, development, or maintenance to ensure the Website conforms with Web Content Accessibility Guidelines 2.1 A/AA, and provides effective

communication to screen reader users. Defendant shall provide accessibility training to all newly-hired employees responsible for website or mobile application design, development, or maintenance within the latter of 210 days of the Court's order or 90 days of their hire date. Commencing in 24 months of the Court's order, Defendant shall ensure that all then-current employees responsible for website or mobile application design, development, or maintenance are provided with refresher accessibility training at regular intervals that shall not exceed two years.

(8) Until further ordered by the Court, Defendant or its Accessibility Consultant shall perform an automated accessibility audit on at least a monthly basis to evaluate whether the Website conforms with Web Content Accessibility Guidelines 2.1 A/AA, and provides effective communication to screen readers. At minimum, the monthly accessibility audit shall include each home or landing page of the Website, and a sampling of web pages that visitors would access to (a) perform a search, (b) view a product, (b) complete a purchase, and (d) contact customer service.

(9) Until further ordered by the Court, Defendant or its Accessibility Consultant shall perform end-user accessibility/usability testing on at least a quarterly (four times per year) basis to evaluate whether the Website conforms with Web Content Accessibility Guidelines 2.1 A/AA, and provides effective communication to screen readers. At minimum, the quarterly end-user accessibility test shall include each home or landing page of the Website, as well as a sampling of web pages that that visitors would access to (a) perform a search, (b) view a product, (b) complete a purchase, and (d) contact customer service.

(10) Until further ordered by the Court, for each new, renewed, or renegotiated contract with a vendor of third-party content, Defendant shall seek a commitment from the vendor to provide content that conforms with Web Content Accessibility Guidelines 2.1 A/AA, and provides effective communication to screen readers.

(11) Defendant shall provide Douglass, through his counsel, with a report on the first, second, and third anniversaries of the Court's order which summarizes the progress Defendant is making in meeting its obligations under the Court's order.

(C) A permanent injunction enjoining Defendant from continuing its retaliatory and coercive conduct in the Tennessee Lawsuit;

(D) Payment of actual, statutory, nominal, punitive, and other damages, as the Court deems proper;

(E) Payment of costs of suit;

(F) Payment of reasonable attorneys' fees under 42 U.S.C. § 12205 and 28 C.F.R. § 36.505, including costs to monitor Defendant's compliance with the judgment;[14]

(G) Whatever other relief the Court deems just, equitable and appropriate; and

(H) An order retaining jurisdiction until Defendant complies with the Court's orders.

Dated: August 4, 2026

*/s/ Kevin W. Tucker*

Kevin W. Tucker (He/Him) (PA 312144)
Stephanie Moore (She/Her) (PA 329447)
Kayla Conahan (She/Her) (PA 329529)
EAST END TRIAL GROUP LLC
6901 Lynn Way, Suite 503
Pittsburgh, PA 15208
Tel. (412) 877-5220
ktucker@eastendtrialgroup.com
smoore@eastendtrialgroup.com
kconahan@eastendtrialgroup.com

[14] *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 559 (1986), *supplemented*, 483 U.S. 711 (1987); *People Against Police Violence v. City of Pittsburgh*, 520 F.3d 226, 235 (3d Cir. 2008) ("This Court, like other Courts of Appeals, allows fees to be awarded for monitoring and enforcing Court orders and judgments."); *Gniewkowski v. Lettuce Entertain You Enterprises, Inc.*, No. 2:16-cv-01898-AJS (W.D. Pa. Jan. 11, 2018) (ECF 191); *Access Now, Inc. v. Lax World, LLC*, No. 1:17-cv-10976-DJC (D. Mass. Apr. 17, 2018) (ECF 11).